**Opal L. THOMPSON, Plaintiff-Appellee,**

v.

**Emmett R. UNDERWOOD, Defendant-Appellant.**

**No. 18618.**

United States Court of Appeals
Sixth Circuit.

March 4, 1969.

" '1. All amounts actually paid or incurred by Contractor under purchase orders properly let or issued by Contractor FOR RAW MATERIALS. These raw materials shall include steel, paint, AND SIMILAR MATERIAL; all to accord with approved specifications.' (Emphasis supplied.)

"Paragraph 2 provides that the rate of $5.20 per hour is 'to cover the direct labor cost, the supporting labor cost, and the indirect labor cost, and ALL OTHER MANUFACTURING BURDENS.' (Emphasis supplied.)

"Paragraph 3 provides that 15% shall be added to the items included in 1 and 2 to cover general and administrative costs, and paragraph 3 further recites that 'it is understood that purchased items listed in Exhibit B AND SIMILAR ITEMS are not to be considered manufacturing costs and are to be excluded from this 15%.' (Emphasis supplied.) Exhibit B does not contain a specific itemization of sand. It could be possible that as a 'similar item' it is included under 'material purchased in the field' and it might be excluded from such Exhibit B which includes 'other items not contributing to Contractor's general and administrative costs.' Certainly, the $66,108.00 worth of sand (including the 15% under B 3) has contributed to the contractor's general costs.

"The matter cannot be disposed of on the simple dictionary definition of 'raw materials' as being 'industrial goods which in part or in whole produce a portion of the physical product.' In finishing steel for use the cleaning is just as necessary as the painting because the paint cannot be applied until the steel is cleaned.

"When the parties defined raw material as including steel, paint and similar materials, it opened the door for someone to determine what 'similar material' is. Can this Court say as a matter of law that it does not include sand which is as essential to preparation of the steel as the paint? The Court thinks not.

"The Court is of the opinion that this item was properly submitted to the jury and should not be disturbed on this motion."

William I. McLain, Memphis, Tenn., for appellant.

J. Frank Hall, Memphis, Tenn., for appellee.

Before CELEBREZZE, McCREE, and COMBS, Circuit Judges.

COMBS, Circuit Judge.

A jury awarded plaintiff-appellee, Opal L. Thompson, $55,000 against defendants, Emmett R. Underwood and Melvin Greer, jointly, as damages for personal injuries resulting from an automobile accident; only the defendant Underwood appeals.

Mrs. Thompson's injuries were received in a two-car collision which occurred at the intersection of US Highway 51 and Cedar Grove Road in Lauderdale County, Tennessee. She was a guest passenger riding in the back seat of Greer's car as it travelled between fifty and seventy miles per hour in a southerly direction on US 51. This is a four-lane divided highway consisting of southbound and northbound lanes, each twenty-four feet wide, with a twenty-eight to thirty-foot wide median separating the lanes. Underwood had been traveling in a westerly direction on Cedar Grove Road, a two-lane highway which intersects US 51 at right angles.

A stop sign had been erected on Cedar Grove Road at the US 51 intersection but the sign had been removed prior to the accident. Underwood apparently stopped anyway before entering the intersection, then proceeded at a constant speed of from ten to twenty miles per hour across the northbound lane of US 51 and into the southbound lane where the accident occurred. Both drivers had unobstructed views for a considerable distance.

The section of US 51 where the collision occurred had not been officially opened for public use. A third layer of asphalt and border lines were yet to be added. North of the accident scene some eight miles, where US 51 intersects Tennessee Highway 88, signs had been erected reading "Road Closed. Anyone Using This Road Is Trespassing;" arrows routed US 51 traffic onto Tennessee 88. "Road Closed" signs were placed at other points of access on US 51, including those intersections such as Cedar Grove Road which the contractor was required to keep open for public use. However, some of the barriers had been overturned or removed. The contractor had also posted twenty miles per hour speed limit signs along US 51 as a directive to heavy vehicles.

Both Underwood and Greer were aware that US 51 had not been officially opened for travel. Underwood was especially familiar with the crossing where the accident occurred since he lived on a hill overlooking this intersection. Despite the unfinished condition of US 51, access was easily attainable and the public frequently used it without objection.

On this appeal defendant-appellant Underwood shoots with a scatter gun. He is critical of virtually every aspect of the trial proceedings ranging from the introduction of plaintiff's first exhibit to statements made by plaintiff's counsel in closing argument. Although twenty-five assignments of error are listed, we find no merit in any of them and affirm the judgment. We consider it necessary to discuss only a few of the claimed errors.

Underwood contends that he was entitled to a directed verdict on the

ground that plaintiff was contributorily negligent as a matter of law in failing to protest when Greer entered US 51. Under the circumstances here shown, it cannot be said that plaintiff was negligent as a matter of law. Her negligence was a question for the jury. Cf. Barr v. Charley, 215 Tenn. 445, 387 S.W.2d 614 (1964); Keith v. Norris, Tenn., 419 S.W.2d 189 (1967).

■ It is also contended that the trial court erroneously admitted in evidence an aerial photograph taken after US 51 was officially opened after the accident. The changes which had occurred between the time of the accident and the date of the photograph were fully explained to the jury; it was therefore properly admitted. Management Services v. Hellman, 40 Tenn.App. 127, 289 S.W.2d 711 (1955).

Underwood also complains of the admission of a portion of Dr. A. H. Crenshaw's deposition on the ground there was no proof the doctor's opinion was based on a reasonable medical certainty and that his opinion was based, at least in part, on hearsay.

■ Tennessee courts have said that, to warrant recovery for a permanent injury, the future effect of the injury must be shown to a reasonable medical certainty. Maryland Casualty Co. v. Young, 211 Tenn. 1, 362 S.W.2d 241 (1962). We regard this as the general rule although all courts do not use these exact words. See Moe Light, Inc. v. Foreman, 238 F.2d 817 (6th Cir. 1956). Here, Dr. Crenshaw testified, "I feel that she has a permanent partial disability to the body as a whole of about 37 percent * * *;" and "by permanent we mean she will always have it." He testified that plaintiff's injuries included contusion of the chest with multiple rib fractures, severe compression fracture of the first lumbar vertebra, compound fracture and dislocation of the left ankle, abrasions and contusions of the right foot, and superficial lacerations of the left arm and elbow. It is clear that the doctor's opinion in regard to permanent disability was based on what he considered a reasonable certainty. Obviously, a court should not disregard the substance of a doctor's testimony merely because he fails to use the magic words "reasonable medical certainty." The district court's instructions included the requirement that, in order to recover for permanent injuries, the future effect of the injuries had to be shown with reasonable certainty. We find no error on this point.

■ Underwood contends that Dr. Crenshaw's opinion was hearsay since he based his determination on a method outlined in a manual published by the American Medical Association. This, too, is an untenable position. Certainly, a doctor may use a reference book in making a diagnosis or prognosis. That is what Dr. Crenshaw did here in reaching his own independent opinion as to the extent of plaintiff's disability.

■ The failure of the district court to give certain tendered instructions is also assigned as error. The tendered instructions are, for the most part, merely quotations from Tennessee statutes. We have examined the district judge's charge with care and conclude that it fairly and adequately presents the issues to the jury. It was not necessary that the instructions be framed in the exact words of the statutes; nor was it necessary to give an instruction based on the premise that US 51 might be considered as a private road or driveway under T.C.A. § 59–831.[1] The witnesses, including the defendant Underwood, were in agreement that this four-lane highway, although it had not been formally opened, was being used generally by vehicular traffic. So, the testimony on this point raised no issue for the jury to decide. A court's instructions should be patterned to fit the case being tried. An abstract exposition of

1. T.C.A. § 59–831 applies only to a "way or place in private ownership." T.C.A. § 59–801 (Definitions).

**998**

the law covering an issue about which there is no factual dispute is not required.

 We will not upset a jury verdict unless the errors complained of affected the substantial rights of the parties. Segal v. Cook, 329 F.2d 278 (6th Cir. 1964). We find no such errors in this case.

Judgment affirmed.